Moriarty, Cornelius J., J.
Plaintiffs, Gordon Haas (Haas) and Dirk Greineder (Greineder), both inmates at Massachusetts Correctional Institute (MCI) Norfolk, a medium security facility, brought this action against the Commissioner of the Massachusetts Department of Correction (DOC), Gary Roden (Roden) and Cynthia Sumner (Sumner) the Superintendent and Deputy Superintendent, respectively, of MCI-Norfolk.[3]
In their Verified Complaint (Complaint), Haas and Greineder, both Catholics, make several claims relating to their temporaiy and partial denial to religious services. They allege that the defendants: (a) violated their constitutional right to the free exercise of religion as guaranteed by the First Amendment of the U.S. Constitution, Article 2 of the Massachusetts Declaration of Rights, Article 46 of the Amendments to the Massachusetts Constitution, and various statutes and regulations[4] (Complaint Counts I, II, and IV);[5] and (b) violated their right to the free exercise of religion as guaranteed by the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. §2000 cc(a)(I)-(2) (Complaint Count III).
In their Verified Supplemental Pleading (Supp. Pleading), the plaintiffs allege that the defendants unlawfully delayed the mailing of their Complaint and retaliated against the plaintiffs for filing the complaint. They allege that the defendants: (a) violated their right to have access to courts pursuant to Article 11 of the Massachusetts Constitution (Supp. Pleading Counts I and II) and (b) retaliated against the plaintiffs for filing their Complaint by issuing disciplinary tickets to plaintiffs in violation of 103 Code Mass.Regs. §430.09(2) and moving plaintiff Greineder to a different cell (Supp. Pleading Counts III, IV, and V).
Plaintiffs’ action is for declaratory relief pursuant to G.L.c. 231A, and they do not seek any monetary damages in either their Complaint or their Supplemental Pleading. The plaintiffs and defendants have both moved for summary judgment on all counts.
FACTUAL BACKGROUND
The facts are divided between those (1) related to the plaintiffs’ suspension of access to religious services and (2) related to the delay in mailing the plaintiffs complaint and the plaintiffs’ claim of retaliation.
1) Plaintiffs’ Suspension of Access to Religious Services
In early March 2011, prison employees intercepted two letters, one written by Haas and one written by Greineder, both referencing improper contact with the Catholic Chaplain (the Chaplain) then volunteering at *624 MCI-Norfolk. Haas’s letter indicated that he gave a letter to the Chaplain to be taken out of MCI-Norfolk and then mailed to third parties, in violation of the prison regulations requiring that inmates send all outgoing mail through proper prison channels. See 103 Code Mass.Regs. §430.24. Greineder’s letter indicated that the Chaplain was looking up information for him on the DOC’s Inmate Management System (IMS) database, which is off-limits to prisoners, in violation of the regulation disallowing prisoners from communicating with a prison volunteer or other prison staff-member for non-official business. Id. Haas and Greineder knew the Chaplain because they had attended her religious services in the Community Services Department (CSD) building.
On March 8, 2011, the Chaplain was interviewed and admitted that she accepted Haas’s letter to mail to third parties and looked up information on the IMS for Greineder. The plaintiffs were then removed from the general population at MCI-Norfolk and placed in the Special Management Unit (SMU) on Administrative Segregation status, per the decision of Superintendent Roden.[6] The next day, on March 9, the Chaplain was detached without pay, pending the results of the investigation. Both plaintiffs were interviewed and also admitted to the improper conduct.[7] After nine days in the SMU, the prisoners were released back into the general population on March 16, 2011.
On March 17, Deputy Superintendent Sumner notified the plaintiffs that they were suspended from the CSD building at MCI-Norfolk. Eleven days later, on March 28, the plaintiffs were allowed to attend Catholic masses on Mondays and Holy Week masses, to the exclusion of all other services held at the CSD.[8]
On April 15 and 16, respectively, Greineder and Haas filed grievances seeking full access to the CSD, because they had not received disciplinary reports.[9] On May 4, Haas was allowed to resume Lifers Group meetings and Greineder was allowed to resume Store and Finance Committee meetings at the CSD, allowances which were memorialized two days later on May 6 in a formal response to the plaintiffs’ grievances. The plaintiffs appealed to Superintendent Roden to get access to the rest of the services at CSD, and Roden denied this appeal.
On May 25, the Chaplain was interviewed again but this time by the Internal Affairs Unit (IAU). During the interview, the Chaplain admitted again that she knew she was not supposed to mail letters for inmates, and that it was wrong of her to have accessed IMS at Greineder’s request. On June 7 and 8, the investigation was signed off by IAU staff and contained findings and conclusions to the effect that the Chaplain had violated eight different DOC rules, regulations and policies, not limited to the improper contact with inmates, improperly giving inmates access to DOC databases, and improperly receiving articles from inmates with the intent to convey them outside of an institution. On June 24, Assistant Deputy Commissioner Karen Hetherson submitted her Executive Review and Decisions, which affirmed that the rules had been violated and indicated that a letter would be sent to Superintendent Roden asking that disciplinary reports be written on Greineder and Haas. The Review also indicated that the investigation was complete.
On July 15, approximately three and one-half months after religious services had been initially suspended, the plaintiffs were issued disciplinary reports and their rights to attend religious services were fully reinstated.[10]
The plaintiffs’ suspensions from attending services, both religious and non-religious, at the CSD building during this three and one-half month period can be summarized as follows: (a) eleven days of being completely barred from the CSD building (March 17-27); (b) about five weeks where the plaintiffs were permitted to attend weekly Catholic mass and Holy Week masses (March 28-May 3); and (c) approximately ten weeks where, in addition to the Catholic masses, the plaintiffs were permitted to attend one non-religious service each (May 4-July 15).
On July 19, Superintendent Roden waived all procedural time limits regarding the disciplinary action of plaintiff Greineder, [11] pursuant to 103 Code Mass.Regs. §430.23.
On August 26, after a hearing, Haas was found guilty of (1) communicating directly or indirectly with any staff member for non-official business, and (2) use of mail or telephone in violation of established regulations as a result of his inappropriate contact with the Chaplain. Haas did not appeal the guilty finding of the report.[12]
On November 7, a disciplinary hearing was held and Greineder was found guilty of (1) communicating directly or indirectly with any staff member for non-official business and (2) violating any departmental rule or regulation, or any other rule, regulation or condition of an institution or community based program, as a result of his inappropriate contact with the Chaplain. Greineder chose not to appeal the guilty finding.
2) The Delay in Delivering the Plaintiffs’ Complaint and the Plaintiffs’ Claim of Retaliation
On June 16, 2011, the plaintiffs’ gave their Verified Complaint to the DOC to be sent to the Clerk of Courts-Worcester County.[13] For an unknown reason, the Verified Complaint was not docketed in the Worcester Superior Court until more than one month later on July 19, 2011, four days after the plaintiffs’ rights to attend religious services were reinstated. The defendants claim that they did not have any knowledge of the delay prior to filing their initial grievances and deny that they are in any way responsible for the delay.
*625 The plaintiffs subsequently filed grievances with the DOC regarding the delay, which were denied on August 19, 2011, by the Institutional Grievance Officer.[14] On August 22 and 23, respectively, Greineder and Haas appealed the denial to Superintendent Roden, who denied both appeals on September 12, 2011.
DISCUSSION Declaratory Judgment Pursuant to G.L.c. 231A
a) Generally
Pursuant to Chapter 231 A, §1, “the superior court . . . may on appropriate proceedings make binding declarations of right, duty, status and other legal relations sought thereby, either before or after a breach or violation thereof has occurred,” so long as “an actual controversy has arisen and is specifically set forth in the pleadings.” The provisions of Chapter 231A are to be “liberally construed and administered,” as its purpose is “to remove, and to afford relief from, uncertainty and insecurity with respect to rights, duties, status and other legal relations.” G.L.c. 231A, §9-
“[A] complaint for declaratory relief is an appropriate way of testing the validity of regulations or the propriety of practices involving violations of rights, which are consistent and repeated in nature.” Nelson v. Commissioner of Corr., 390 Mass. 379, 388 n.12 (1983). A prisoner can challenge the “interpretation of [a statute], [the defendant’s] practice of acting under that interpretation, and the construction of the regulations and handbook.” Henderson v. Commissioner of Corr., 49 Mass.App.Ct. 455, 458 (2000), citing G.L.c. 231A, §2. A prisoner can also allege violations of the state and federal constitution. Id. at 462-68.[15] The plaintiffs here are appropriately seeking declaratory relief to challenge whether the practices of the prison, under their interpretations of the regulations and statutes, violated their constitutional right to the free exercise of their religion.
b) Standing
The plaintiffs have standing to seek declaratory relief so long as there is an “actual controversy.” G.L.c. 231A, §1. Typically, no actual controversy exists unless the determination of the issue would have an “immediate impact” on the litigants. Gay and Lesbian Advocates & Defendants v. Attorney General, 436 Mass. 132, 135 (2002); Mass. Ass’n of Indus. Ins. Agents and Brokers, Inc. v. Commissioner of Ins., 373 Mass. 290, 292 (1977). However, even where the issue is moot (i.e. there will not be any “immediate impact” on the litigants), a judge has the discretion to hear the issue if it is “of public importance, capable of repetition, yet evading review." Aime v. Commonwealth, 414 Mass. 667, 670 (1993) (emphasis added), citing Superintendent of Worcester State Hosp. v. Hagberg, 374 Mass. 271, 274 (1978) (“In such circumstances, we do not hesitate to reach the merits of cases that no longer involve a live dispute so as to further the public interest”).
Both of the primary issues in this case are moot. First, the issue regarding the suspension of religious services is moot, because full access to religious services has been returned to the plaintiffs. Second, the issue regarding the prison’s delayed delivery of the plaintiffs’ Complaint is moot, because the Complaint was ultimately timely filed and, regardless, the Complaint is deemed to have been filed when the plaintiffs originally gave it to the prison.[16]
However, this Court will use its discretion to review the plaintiffs’ constitutional claims because they are “of public importance, capable of repetition, yet evading review.” See, e.g., Mendonza v. Commonwealth, 423 Mass. 771, 777 (1996), and cases cited; Champagne v. Commissioner of Corr., 395 Mass. 382, 386 (1985). In Champagne, the prison was refusing to give certain books to a prisoner, and the prisoner filed suit alleging violations of his First Amendment rights. Despite the fact that the prison delivered the books to the prisoner after the complaint had been filed, the Supreme Judicial Court decided the issue, reasoning that “because this case concerns a prisoner’s First Amendment rights, we think that, even though the case is factually moot, the underlying constitutional questions are ‘of public importance, capable of repetition, yet evading review.” Id. (citations omitted).[17] The two issues here, the suspension of religious services and delay in delivering the Complaint, both involve constitutional questions and this Court likewise finds that they should be reviewed.
Furthermore, the issues in this case are certainly capable of evading review. The prisoners here had their services (except for Catholic mass) suspended for approximately three and one-half months and the mail delayed for about a month, and, in other situations, the prison could remove services or delay sending mail for other prisoners for any period of time.[18] Compare Brach v. Chief Justice of the District Court Dept., 386 Mass. 528, 533 (1982) (regulation requiring immediate surrender of a driver’s license, and subsequent revocation by the Registrar, by defendants convicted of certain motor vehicle offenses was deemed to be “apt to evade review” because the whole process only took three to four weeks). Contrast M.C., 399 Mass. at 911 (two years is sufficient time to litigate).
Therefore, this Court will proceed to the merits of the case.
Standard of Review
The claims of this case are being reviewed in the context of cross motions for summary judgment. Summary judgment is appropriate when, viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Cargill, Inc. v. Beaver Coal *626 & Oil Co., 424 Mass. 356, 358 (1997). The moving party has the burden of affirmatively demonstrating that no genuine issue of material fact exists. Kitras v. Zoning Adm’r of Aquinnah, 453 Mass. 245, 251 (2009). If the moving party meets this burden, the burden is shifted to the non-moving party to demonstrate, through admissible evidence, an issue of material fact. Godbout v. Cousens, 396 Mass. 254, 261 (1985). Summary judgment may enter where the nonmoving party “failed to make a sufficient showing on an essential element of her case.” Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).
Complaint Counts I, II, and IV: Violation of State and Federal Constitutional Rights to the Free Exercise of Religion
The plaintiffs have brought free exercise claims and, in so doing, argued several violations of statutes and regulations. However, these alleged statutory and regulatory violations are without merit and mostly unrelated to the free exercise claims. Therefore, the issues will be dealt with separately and this section is divided between (a) Alleged Statutory/Regulatory Violations and (b) Free Exercise Claims.
1) Alleged Statutory/Regulatory Violations
The plaintiffs alleged violations of G.L.c. 127, §§32 and 88, G.L.c. 124, §1(e), 103 DOC §473.02(2), and 103 Code Mass.Regs. §471.07 in support of their argument, but these sources do not help their cause. The sources cited protect inmates and require that they be treated equally, but not where security or disciplinary reasons require otherwise.[19] As explained below, the prison’s actions were an appropriate disciplinary response that furthered the important interests of institutional securily and good order.
The plaintiffs also allege a violation of a disciplinary regulation, 103 Code Mass.Regs. §430.09(2), because the prison failed to timely issue a disciplinary report. However, even if the regulation is violated, it provides no private cause of action.[20] A violation of the regulation is not relevant to the analysis of the free exercise claims and therefore it will not be considered.
Therefore, these statutory and regulatory claims in Complaint Counts I, II, and IV fail.
2) Free Exercise Claims under the State and Federal Constitutions
At the outset, it should be noted that inmates’ free exercise rights are protected “even when the infringement results from the imposition of legitimate disciplinary measures.” McEachin v. McGuinness, 357 F.3d 197, 204 (2d.Cir. 2004). See also Young v. Coughlin, 866 F.2d 567, 570 (2d.Cir. 1989); Lovelace v. Lee, 472 F.3d 174, 188 (4th. Cir. 2006) (“It makes no difference to this analysis that the burden on [the prisoner’s] religious exercise resulted from discipline (punishment for his alleged infraction), rather than from the prison’s failure to accommodate his religious needs in the first instance”). (Citation omitted.) Therefore, this Court will review the plaintiffs’ free exercise and RLUIPA claims, which are based on the prison’s response to the plaintiffs’ suspected violation of prison rules.
The free exercise analysis under the Massachusetts Constitution was explained by the Supreme Judicial Court in Rasheed v. Commissioner of Corr., 446 Mass. 463 (2006). In the first stage, the inmates must show that the prison has substantially burdened their right to freely exercise their religion. Id. at 467. If such a burden exists, the prison must show that “(1) it has an interest sufficiently compelling to justify that burden and (2) the granting of an exemption to persons in [the inmate’s] position would unduly burden that interest.” Id., citing Attorney Gen. v. Desilets, 418 Mass. 316, 322-25 (1994). Here, although the plaintiff may be able to establish a substantial burden, the free exercise claim fails because the prison’s actions were narrowly tailored to satisfy the compelling interests of security and good order.
In the first stage of the analysis, the plaintiffs must show that there is a “substantial” burden on the free exercise of their religion. Rasheed, 446 Mass. at 472 (citation omitted).[21] “[I]ncidental effects of government programs, which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs” do not constitute a substantial burden. Id. at 472, quoting Curtis v. School Comm. of Falmouth, 420 Mass. 749, 762 (1995) (quotations omitted).[22] In the present case, the plaintiffs’ rights to the free exercise of their religion were likely substantially burdened because they were denied access to religious services, including the Sacrament of Reconciliation. See Hudson v. Dennehy, 538 F.Sup.2d 400, 412 (D.Mass. 2008) (in a RLUIPA case, determining that a substantial burden exists where prisoners are banned from attending obligatory weekly Jum’ah services) .
However, that is not the end of the inquiry. The prison intentionally suspended access to the CSD building, and consequently religious services held in that building, in response to the violation of a prison rule. The Court must determine whether temporarily suspending the plaintiffs’ rights to attend religious services furthers a compelling government interest and whether an exemption for the inmates would unduly burden that interest. This Court finds that the answer to both questions is affirmative. Violations of prison rules are breaches of security and, if they go unpunished, harm the well-being and safely of the institution and its employees, prisoners, and visitors.
There is no question that “the department has a compelling interest in ensuring the safely of its staff and its inmates and the integrity of its institutions.” Rasheed, 446 Mass. at 474, citing Cutter v. Wilkinson, 544 U.S. 709, 721-22 (2005) (compelling interest standard to be applied with due deference to need to *627 maintain order, security, and discipline in prison). To be sure, the DOC “need not wait until specific breaches of safety and security arise to take reasonable measures . . . based on the exercise of professional judgment, to guard against the undermining of its unusually important goals.” Id. at 474. Here, the “specific breaches of security” occurred prior to the disciplinary measures imposed. The purpose of requiring that mail be sent only through the DOC is to preserve institutional security by monitoring communication and objects (including contraband or weapons) going in and out of the prison. Therefore, any mail sent through other channels, as was done here, is considered a possible security breach. Similarly, the purpose of limiting the inmates’ access to computers is to preserve institutional security by monitoring communication going in and out of the prison, meaning that the unauthorized use of the computers is also a possible security breach.
Furthermore, the prison has “the compelling State interest of rehabilitating prisoners and promoting good order [and] [ijnducing prisoners to comply with prison rules by limiting certain liberties is consistent with this interest.” Hudson v. Dennehy, 538 F.Sup.2d 400, 412 (D.Mass. 2008), citing Cutter v. Wilkinson, 544 U.S. 709, 722-23 (2005).[23] See also Johnson v. California, 543 U.S. 499, 512 (2005) (recognizing the “necessities of prison security and discipline”). Additionally, for issues regarding prison security, “deference is due to institutional officials’ expertise in this area.” Spratt v. Rhode Island Dep’t of Corrs., 482 F.3d 33, 39 (1st Cir. 2007), quoting Cutter, 544 U.S. at 725 n. 13. It is important to the character of the institution and the safety of the people involved that order is kept by ensuring that the prison rules are followed. Here, the prison suspended the plaintiffs’ right to enter the CSD building as a disciplinary response to the plaintiffs’ suspected rule violation through a Chaplain at the CSD building. Essentially, the prison suspected the right was abused so it was temporarily taken away. In other words, the prison was “[i]nducing prisoners to comply with prison rules by limiting certain liberties” in order to “promot[e] good order.” Hudson, 538 F.Sup.2d at 412 (citation omitted).
Therefore, the prison had a compelling interest to suspend access to the CSD building, including religious services at the building.
In the last stage of the analysis, the prison must show that an exemption for the inmates in this case would not be appropriate because it would unduly burden the compelling interest. Rasheed, 446 Mass. at 467 (citation omitted). Thus, the actions taken by the prison must be narrowly tailored to further the compelling government interest. Ahmad v. Department of Corn, 446 Mass. 479, 485 (2006), citing Rasheed, 446 Mass. at 465. Here, the prison’s actions were narrowly tailored because (1) they were the only means available to effectively further the compelling interest and (2) the prison still permitted the prisoners to attend weekly Catholic mass and Holy Week masses.
The suspension of the plaintiffs’ rights to enter the CSD building was necessary because it was a direct response to the plaintiffs’ violations of prison rules committed through the use of the Chaplain who conducted the religious services in the CSD building. Of course, the prison cannot arbitrarily remove or suspend religious rights that are completely unresponsive to the prisoners’ suspected offense or unrelated to the discipline imposed. See, e.g., Young v. Coughlin, 866 F.2d 567, 570 (2d.Cir.1989) (placement into disciplinary lockup does not thereby warrant an unrelated restriction of religious rights). Rather, the restrictions must be “reasonably related to legitimate penological interests.” O’Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987) (overruled on other grounds). However, where the discipline is responsive to the offense committed, as is the case here, it is permissible and appropriate to restrict the prisoner’s religious rights. In order to deter plaintiffs from abusing the use of the CSD building and committing further breaches of security, it was necessary to suspend their right to use the CSD building. Additionally, to promote the government’s interest of preserving good order, it was necessary to punish the prisoners in a fashion that was directly responsive to their conduct.
Furthermore, the prison did not completely bar the plaintiffs from attending religious services; rather, they showed deference to the plaintiffs’ beliefs by permitting them to attend weekly Catholic masses and Holy Week masses. Therefore, the prison’s actions were narrowly tailored and an exemption to the plaintiffs would be inappropriate.[24] Because “the scope of protection afforded the right to freely exercise one’s religion under the Massachusetts Constitution is greater than that afforded by the United States Constitution," any claims the plaintiff asserts under the First Amendment of the U.S. Constitution likewise fail. Rasheed, 446 Mass. at 467.
Therefore, the plaintiffs’ free exercise of religion claims under the state and federal constitutions in Complaint Counts I and II must fail.
Complaint Count III; Violation of the Religious Land Use and Institutionalized Persons Act
To prevail on their claim under the Religious Land Use and Institutionalized Persons Act (“RLUIPA”), 42 U.S.C. §§2000cc-1 et seq., the plaintiff inmates must show that the facility imposed a substantial burden on the exercise of their religious freedoms. Ahmad, 446 Mass. at 485. If the inmates succeed in making such a showing, then the facilities “must prove that the policies are in furtherance of a compelling governmental interest and are the least restrictive means of furthering that compelling governmental interest.” Id.
*628 The analysis under RLUIPA has been deemed to be the same as under the Massachusetts Constitution. The Supreme Judicial Court has stated:
While RLUIPA holds the government to a higher standard than that required in the [federal constitution] with respect to the free exercise of religion clause of the First Amendment, that standard is consistent with the stricter standard we adopted in Rasheed v. Commissioner of Correction ... In other words, if the prison regulations and policies challenged by [the inmate] are permissible under the Massachusetts Constitution, they will meet the requirements of RLUIPA.
Rasheed, 446 Mass. at 485-86. Therefore, the plaintiffs’ claims under RLUIPA in Complaint Count III likewise fail.
Supp. Pleading Counts I and II: Violation of Right of Access to Courts 1) Timing of the Complaint
The timing of the filing of the complaint is relevant to the degree of injury received by the plaintiff. There is no dispute that the plaintiffs gave their complaint to the prison on June 16,2011, but the complaint was not docketed in Worcester Superior Court until July 19, 2011. Pursuant to Commonwealth v. Hartsgrove, 407 Mass. 441 (1990), the complaintis deemed to have been filed on June 16, 2011, when the plaintiffs gave the complaint to the prison. In the context of a pro se inmate’s notice of appeal, the Supreme Judicial Court adopted the “prison mailbox rule,” holding that “the filing with the clerk . . . should be deemed to have occurred on the inmate’s relinquishment of control of his notice of appeal to the prison authorities." Commonwealth v. Hartsgrove, 407 Mass. 441, 444 (1990) (emphasis added). The Court went on to explain:
[T]he pro se prisoner has no choice but to entrust the forwarding of his notice of appeal to prison authorities whom he cannot control or supervise and who may have every incentive to delay . . . and the only information he will likely have is the date he delivered the notice to those prison authorities and the date ultimately stamped on his notice.
Id. at 445-46 (1990), quoting Houston v. Lack, 487 U.S. 266, 270-72 (1988).
There has been some dispute as to whether the prison mailbox rule articulated in Hartsgrove should be extended to the filing of complaints, although there is no binding precedent on this matter. See Felt v. Commissioner of Corr, 2009 Mass.App. Unpub. LEXIS 770, No. 08-P-1245, at *4-*6 (Mass.App. June 15, 2009) (in a certiorari claim, the court “declin[ed] to address the issue of the applicability of the prison mailbox rule to civil litigations filings”). Two Superior Court decisions, however, reached different conclusions. In Tibbs v. Dipalo, the Superior Court refused to apply the prisoner mailbox rule to complaints for certiorari, contrasting Hartsgrove by arguing that prison sanctions involve a less significant liberty interest than a criminal conviction. 2000 Mass.Super. LEXIS 202, 2000 WL 1273854, at *3 (Mass.Super. March 2000) [11 Mass. L. Rptr. 589]. The holding in Tibbs was specifically rejected by the Superior Court in Anderson v. Dennehy, 24 Mass. L. Rptr. 306, 2008 Mass.Super. LEXIS 188 (Mass.Super. June 12, 2008). In applying the prisoner mailbox rule to a complaint for certiorari, the court reasoned that “(t]he mode of filing a complaint and the commencement of the statute of limitations should not depend on the type of action which the complaint initiates . . .” Id. at *10.
This Court is persuaded by the reasoning in Anderson and, therefore, now holds that the prisoner mailbox rule should apply to all complaints, including, as here, complaints for declaratory relief. Thus, the plaintiffs’ complaint is deemed to have been filed on June 16, 2011, when the complaint was given to the prison employees to deliver to the court.
2) Violation of the Right of Access to Courts
The prisoners allege that the DOC violated its own mail regulations as well as the plaintiffs’ constitutional right of access to courts. However, the violation of the regulations does not provide an independent cause of action.[25] Therefore, this issue is viewed in the context of the plaintiffs’ access to courts claim, which is based upon Article XI of the Massachusetts Constitution.
Article XI states: “Every subject of the commonwealth ... ought to obtain right and justice freely, and without being obliged to purchase it; completely, and without any denial; promptly, and without delay; conformably to the laws.” (Emphasis added.)[26] The inmates assert that the prison infringed their right to free and prompt access to courts, as provided in Article XI of the Massachusetts Constitution, when they delayed the delivery of the inmates’ complaint for over a month.
To warrant review of this constitutional claim, the inmates must show that they received an actual injury; in other words, they must “show that [the] alleged deficiencies hindered [their] efforts to present a non-frivolous legal claim” Puleio v. Commissioner of Corr., 52 Mass.App.Ct. 302, 311 (2001), citing Lewis v. Casey, 518 U.S. 343, 351 (1996) (emphasis added). See also Bounds v. Smith, 430 U.S. 817, 823 (1977) (in an access to courts claim, “ ‘meaningful access’ to the courts is the touchstone” (citations omitted)). It is clear that a delay in sending an inmate’s complaint or other timely court documents causes an actual injury if the tardiness results in the dismissal of the claims or an inability to file the complaint. Lewis, 518 U.S. at 351. See also Jackson v. Procunier, 789 F.2d 307, 311 (5th Cir.Tex. 1986) (a deliberate delay in sending inmate’s notice of appeal to appeals court, resulting in a dismissal of the appeal, “constitute[s] a constitutional deprivation”). This Court is not aware of any binding precedent that has found a constitutional injury where the delay itself is the only injury; however, other *629 circuits have so held. See, e.g., Castillo v. Cook County Mail Room Dep’t, 990 F.2d 304, 307 (7th Cir. 1993) (holding that ongoing interference with legal mail was sufficient to state a First Amendment claim); Green v. Johnson, 977 F.2d 1383, 1389 (10th Cir. 1992) (“Any deliberate impediment to access [to the courts], even a delay of access, may constitute a constitutional deprivation”). (Emphasis added.) Additionally, in Murphy v. Cruz, the Massachusetts Superior Court determined that a prison official’s unauthorized opening of a prisoner’s privileged legal mail was “[s]uch an obvious violation of a clearly established right [that it] subjects [the prison official] to exposure for damages caused by that violation.” 1999 WL 35001126 (Super.Ct. Sept. 27, 1999).[27]
Here, despite the fact that the underlying claims are ultimately unsuccessful, the one-month delay in sending the complaint constituted an injury to the plaintiffs, as it directly hindered their ability to file legal claims. Puleio, 52 Mass.App.Ct. at 311. The injury is the delay in having the petitioner’s ongoing legal conflict resolved.
Turning to the merits, it is clear that the prison violated the plaintiffs’ right of access to the courts if the delay was intentional.[28] First, the prison did violate its own mail regulations, which is evidence of a violation of the plaintiffs’ access to courts. The DOC’s Inmate Mail Regulations state that a prisoner’s mail sent to “[a]ny officer of a court of the United States or of the Commonwealth of Massachusetts . . . [such as a] clerk ...” shall remain privileged. 103 Code Mass.Regs. §481.11. Therefore, the mail addressed to the Clerk’s Office in Worcester Superior Court is privileged. Id. “Outgoing privileged mail shall not be opened for inspection or any other purpose or otherwise impeded in its transmission.” 103 Code Mass.Regs. §481.12 (emphasis added).[29] Furthermore, “[o]utgoing mall shall be delivered to the post office . . . within 24 hours of collection) ] from the inmates . . .” 103 Code Mass.Regs. §481.08(3) (emphasis added). Here, the DOC violated the regulation because, instead of delivering the mail to the post office within twenty-four hours, it did so more than a month after collection.
Furthermore, as articulated by the Fifth Circuit Court of Appeals, the “transmission of legal documents which prisoners wish to send to the courts” is one of the “most obvious and formal manifestation[s]” of the right of access to the courts. Crowder v. Sinyard, 884 F.2d 804, 811 (5th Cir.Tex. 1989) (citations omitted). Intentionally delaying sending an inmate’s complaint or other important legal documents to the court is perhaps the most clear violation of an inmate’s right of access to courts.[30] Similar to Murphy, it is an “obvious violation of a clearly established right.” 1999 WL 35001126 (Super.Ct. Sept. 27, 1999). The plaintiffs here do not seek damages, but this Court does declare that the prison cannot intentionally delay delivering a prisoner’s mail.[31]
Therefore, the plaintiffs are entitled to a declaratory judgment on Supp. Pleading Counts I and II.
Supp. Pleading Counts III, IV, and V: Retaliation
The plaintiffs allege that the prison retaliated against the plaintiffs for filing the complaint by, (a) issuing a disciplinary report in violation of the timing requirements of 103 Code Mass.Regs. §430.09 and (b) moving plaintiff Greineder to a different cell, located in the Probation Dormitory Block. However, this claim is without merit. First, the alleged late issuance of the disciplinary report is not relevant to the retaliation claim and does not provide a private cause of action.[32] Second, the plaintiffs have provided no legal support for the claim that it is improper or abnormal to move a prisoner into a different cell after he is charged with a disciplinary offense. Therefore, the plaintiffs’ retaliation claims in Supp. Pleading Counts III, IV, and V fail.
ORDER
For the foregoing reasons, it is ORDERED that the plaintiffs’ Motion for Summary Judgment is ALLOWED in part, as follows; judgment shall enter for the plaintiffs on Supp. Pleading Counts I and II and the Court thereby declares that, if intentional, the prison’s delay in delivering the plaintiffs’ Complaint to the Worcester Superior Court constituted a violation of the plaintiffs’ right of access to courts. The remainder of the plaintiffs’ Motion for Summary Judgment is DENIED.
It is further ORDERED that the defendants’ Cross Motion for Summary Judgment is ALLOWED in part’ as follows: judgment shall enter for the defendants on Complaint Counts I, II, III, and IV, and Supp. Pleading Counts III, IV, and V. The remainder of the defendants’ Cross Motion for Summary Judgment is DENIED.

 The plaintiffs will be referred to collectively as “the inmates.” The defendants will be referred to collectively as “the facilities.”

 In regard to the claims based upon statutes and regulations, the plaintiffs characterized some of the claims as violations of their “right to participate in rehabilitative programming" (Count IV] and others as violating their freedom of expression (Counts I and II), but the claims are denied for similar reasons and can be grouped together.

 The plaintiffs have brought the state constitutional claims pursuant to the Massachusetts Civil Rights Act, G.L.c. 12, §§11H and 111, which state that “(a]ny person whose exercise or enjoyment of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, has been interfered with, or attempted to be interfered with” through “threats, intimidation, or coercion” can bring an action for “injunctive or other appropriate equitable relief.” G.L.c. 12, §11H and 111. The plaintiffs also inappropriately asserted a violation of the Massachusetts Civil Rights Act as an independent claim, which will be disregarded.

 SMU is defined as “a separate housing area from the general population ... for reasons of administrative segregation, protective custody, or disciplinary detention.”

 Haas admitted to giving the Chaplain a letter to be mailed to third parties and Greineder admitted that he had the Chaplain look up information for him on IMS.

 Greineder was also permitted to attend a family mass held on April 8, 2011.

 Greineder filed grievance #52266 on April 15, 2011, and Haas filed grievance #52268 on April 16, 2011.

 Disciplinaiy Report #231731 was issued to Haas, “finding him guilty of (1) communicating directly or indirectly with any staff member for non-official business; and (2) use of mail or telephone in violation of established regulations as a result of his inappropriate contact with the Catholic Chaplain working in the CSD.” Disciplinary Report #231729 was issued to Greineder, “finding him guilty of (1) communicating directly or indirectly with any staff member for non-official business; and (2) violating any departmental rule or regulation, or any other rule, regulation, or condition of an institution or community based program as a result of his inappropriate contact with the Catholic Chaplain working in the CSD.”

 Disciplinary Report #231729.

 Disciplinary Report #231731.

 As further proof, on June 16, $2.39 was withdrawn from the account of Haas for postage for mail to be sent to the Clerk of Courts-Worcester County.

 They filed Inmate Grievances #54118 and #54417.

 The defendants claim that the complaint should be dismissed because the plaintiffs have not shown that taking away privileges during an investigation is the “customary and usual method of conducting . . . business,” as stated in the second sentence of §2, because, they claim, the decision to take privileges in this case was one distinct, isolated act. See G.L.c. 231 A, §2. However, the defendants provide no citations to support this proposition. See also Henderson v. Commissioner of Corr., 49 Mass.App.Ct. 455, 462-68 (2000) (addressing constitutional questions in an action for declaratory relief).

 See infra subsection entitled “Timing of the Complaint” in section addressing Supp. Pleading Counts III, IV, and V.

 Cf. M.C. v. Commissioner of Corr., 399 Mass. 909, 910-12 (1987) (declining to hear amoot constitutional issue, because “(t]o do otherwise would violate the principles of judicial restraint which require us to refrain from unnecessarily deciding constitutional questions"), citing Lockhart v. Attorney Gen., 390 Mass. 780, 784 (1984).

 In fact, the plaintiffs introduced evidence that another prisoner had his privileges suspended for one week.

 G.L.c. 127, §32 “has been construed to assure 'equal treatment, as far as may reasonably be, for prisoners who are not being disciplined.’ ” Hastings v. Commissioner of Corr., 424 Mass. 46, 53 (1997), quoting Blaney v. Comm. of Corr., 374 Mass. 337, 341 (1978) (emphasis added). G.L.c. 124, §1(e) requires that rehabilitative programs must be fairly provided to all inmates equally, subject to the interests of security and good order. See Cepulonis v. Maloney, no. 0200339, 2003 WL 734412, at *3 (Mass.Super. January 22, 2003) [15 Conn. L. Rptr. 683] (citations omitted). Code Mass.Regs. §471.07(1) states generally that “(t]he rights of inmates to practice their religious beliefs, or to confer with the clergy person of an accredited religious group shall not be abridged, providedthat these activities do not threaten the safety, security and orderly running of the institution.'’ (Emphasis added.) 103 DOC 473.02(2) is inapplicable to this case.

 103 Code Mass.Regs. §430.02 states that “103 CMR 430.00 is not intended to confer any procedural or substantive rights not otherwise granted by state or federal law.”

 There is no dispute that the plaintiffs’ religious beliefs are sincerely held.

 Compare Rasheed, 446 Mass. at 474 (prohibiting food required by religion places a substantial burden, because it “has the tendency to coerce” the plaintiff to eat non-sanctioned food), with Abubardar v. Department of Corr. Grievance Coordinator, 78 Mass.App.Ct. 1126, at *1 (Feb. 10, 2011) (unpublished decision) (no substantial burden of religion where a Muslim prisoner, although inconvenienced by having a cellmate, was still able to perform his prayer rituals) (citation omitted).

 This Court determines that Hudson, though not authoritative, has persuasive value.

 Where, as here, the compelling interest for restricting actions is based entirely upon a proper disciplinary response to the plaintiffs’ conduct, and not a policy or regulation with broader implications, the plaintiff cannot be exempt.

 The plaintiffs cannot assert a claim based solely on the violation of the DOC regulation. 103 Code Mass.Regs. §481.00 is “not intended to confer any procedural or substantive rights or any private cause of action not otherwise granted by state or federal law.” 103 Code Mass.Regs. §481.02.

 See Simmons v. Dickhaut, 804 F.2d 182, at *2-*4 (A.C. 11986) (unpublished decision), and cases cited. Discussing right of access claims under the federal constitution, the Court stated: “The right of access is a discrete, constitutional right, derived from various constitutional sources. It springs in part from the due process clause . . . the privileges and immunities clause . . . and the First Amendment.” Id. at *2.

 No page number is provided for this case.

 The defendants deny having any knowledge about how the delivery of the complaint was delayed. Thus, whether the delay was intentional is a disputed question of fact. However, because no damages are sought, it is not material to this decision.

 It is also required that the mail “include! ] the inmate’s name and return address,” is “marked by the institution to indicate to the addressee that it has not been inspected or opened,” and “successfully passes afluoroscope examination for contraband material.” 103 Code Mass.Regs. §481.12. It appears that these requirements were met, as they are not at issue here.

 It is unlike other issues, such as those regarding the adequacy of legal resources provided to the inmates, where it is difficult to establish that the deficiency complained of actually delayed or otherwise affected the inmates’ ability to file a legal claim. See, e.g., Puleio, 52 Mass.App.Ct. at 311 (rejecting plaintiffs access to court claim based on inadequate library resources and limited access to legal papers).

 Even if the plaintiffs did seek damages, they would be nominal. See Champagne v. Commissioner of Com., 395 Mass. 382, 389-90 (1985). In Champagne, the inmate’s access to courts claim was based on a prison guard allegedly opening and inspecting legal correspondence sent to the inmate from his attorney, in violation of department regulations. Id. The Court reasoned that, because the inmate “received the correspondence before commencing this action, the issue has been mooted . . . [and] [a]t most he would have been entitled to an award of nominal damages.” Id. at 390 (citations omitted). Here, the plaintiffs complaint is considered filed when given to prison officials, and the underlying claims of the complaint are unsuccessful. Therefore, nominal damages would similarly be appropriate.

 See supra subsection entitled “Alleged Statutoiy/Regulatory Violations.”